
2015 JUL 27 AM 10: 3

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

               Respondent,

        v.

MICHAEL ALAN HELMER,

               Appellant.

No. 71607-7-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: July 27, 2015

APPELWICK, J. — Helmer appeals his conviction of four counts of second degree assault. He asserts that his self-defense instruction was deficient, because it did not make clear to the jury that it should consider his PTSD when deciding his culpability. In his statement of additional grounds, he argues that there is insufficient evidence to support his convictions. We affirm.

## FACTS

On the night of August 18, 2012, Michael Helmer went to the Bamboo Bar & Grill in West Seattle with a group of people, including Helmer's friend Christopher Dahl. Helmer wore a green Seahawks jersey.

Patrick Shandy and Michael Hardin were also at Bamboo Bar that night. As Helmer's group was gathering to leave, Shandy and Dahl got into a fight outside the bar.

Helmer tried to pull Dahl out of the fight. At some point, Helmer felt a push from behind. Helmer pulled out the gun he was carrying on his right hip.

Hardin had come outside for a cigarette and he saw two men kicking Shandy on the ground. Hardin grabbed the man closest to him and pulled him away. He let go when he noticed that the other man had a gun. Hardin then walked towards the bar and started to feel very dizzy. He looked down and saw he had blood all over his body. He had been shot in the left shoulder.

Nicholas Miller was also at Bamboo Bar that night with his roommate, Jacob Washburn. Miller noticed two men, one in a green jersey, hitting someone on the ground outside. Miller, Washburn, and another Bamboo Bar patron, Michael Lescault, went out to break up the fight. 9When Miller, Washburn, and Lescault exited the bar, Helmer pointed his gun at their faces. The men put their hands up and backed away.

Joshua Bass, who lived next door to Bamboo Bar, came outside after he heard the gunshot. He saw a man kicking someone on the ground and another man in a green jersey holding a gun. As Bass called 911, he saw the two men walk away down the beach.

Miller also called 911 and spoke to the police as he followed Helmer down the beach. Miller saw Helmer take off his jersey, wrap the gun in it, and place it in the wheel well of a car. Officers soon recovered the gun and the jersey. They arrested Helmer on the beach.

Helmer was charged with fourth degree assault as to Shandy, first degree assault as to Hardin, and second degree assault as to Miller, Washburn, and Lescault.

At trial, Helmer argued that he acted in self-defense when he brandished his gun. His defense was largely supported by the testimony of Dr. Mark McClung, a psychiatrist who diagnosed Helmer with posttraumatic stress disorder (PTSD). Helmer's father killed his mother when he was a young child. Dr. McClung testified that, as a result of this and other traumatic experiences, Helmer has had problems with feeling on guard, vigilant, and afraid. Dr. McClung explained that PTSD can cause anxiety, fear, and panic reactions. He stated that it can also cause disassociation, where an individual feels detached rather than present in a situation; distortions of time sensation and sensory perception; spotty memory as to critical events; and hypervigilance. Dr. McClung explained that those with PTSD can experience flooding, where one becomes overwhelmed with emotions and fearfulness, which decreases the ability to calmly assess a situation and respond appropriately. He opined that Helmer's actions could have been the product of fear.

Helmer also testified in his own defense. Helmer had experienced blackouts and had an incomplete memory of the night. His testimony was as follows. He did not recall pulling the trigger, but knew that he must have. He must have been afraid when he pulled out his gun. He had been pushed immediately prior to pulling out his gun. There was chaos around him and people everywhere. Just before Miller, Washburn, and Lescault came out, someone pulled on his arm. Although he knew at the time of trial that the three men were not there to hurt him, he did not know it that night. At the time, he felt like strangers were coming after him. He felt like he did not have control and was only able to react to what was happening.

The trial court gave the self-defense instruction proposed by defense counsel. The instruction read, in relevant part,

> The person using or offering to use the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of the incident.

During deliberations, the jury submitted two questions. The first said, "Question surrounds definition of intent with respect to timing. Is measurement of intent restricted to the actual event of pulling the gun's trigger, or can the defendant's mindset and events leading up to the pulling of the trigger also be considered in establishing intent?" The second asked, "Should the PTSD diagnosis be considered in delib[e]ration as it relates to one[']s thought process and actions vs. someone not diagnosed with PTSD? Should the PTSD be taken into consideration when determining our verdict?" In response to both questions, the court instructed the jury to "[p]lease review your jury instructions."

The jury found Helmer not guilty of fourth degree assault as to Shandy and not guilty of first degree assault as to Hardin. It found Helmer guilty of the lesser included offense of second degree assault as to Hardin. It also found Helmer guilty of second degree assault as to Miller, Washburn, and Lescault.

Helmer appeals.

## DISCUSSION

### I.  Self-Defense Instruction

Helmer argues that his self-defense instruction was constitutionally deficient, because it did not instruct the jurors to consider his PTSD when assessing the

4

reasonableness of his actions.[1] As a result, Helmer asserts, the trial court abused its discretion in declining to further instruct the jury that it could consider prior events and circumstances, including Helmer's PTSD. Helmer also alleges that the presentation of the instruction constituted ineffective assistance of counsel. Both of these challenges require us to first determine whether Helmer's self-defense instruction was deficient. See State v. Sublett, 156 Wn. App. 160, 184, 231 P.3d 231 (2010) (trial court did not abuse discretion in declining to further instruct jury where given instruction was not ambiguous and correctly stated the law), aff'd, 176 Wn.25 58, 292 P.2d 715 (2012); State v. Studd, 137 Wn.2d 533, 550-51, 973 P.2d 1049 (1999) (defendant may raise ineffective assistance claim based on erroneous jury instruction).

We review the sufficiency of jury instructions de novo. State v. Walker, 182 Wn.2d 463, 481, 341 P.3d 976 (2015). Jury instructions are sufficient if they allow both parties to argue their theory of the case, are not misleading, and, when read as a whole, properly inform the trier of fact of the applicable law. State v. Harris, 164 Wn. App. 377, 383, 263 P.3d 1276 (2011).

Self-defense instructions must make the relevant legal standard "'manifestly apparent to the average juror.'" State v. Allery, 101 Wn.2d 591, 595, 682 P.2d 312 (1984) (quoting State v. Painter, 27 Wn. App. 708, 713, 6230 P.2d 1001 (1980)). The jury must assess evidence of self-defense "from the standpoint of the reasonably prudent person,

---

[1] The invited error doctrine prevents a defendant from presenting a jury instruction and then complaining about it on appeal. State v. Studd, 137 Wn.2d 533, 546-47, 973 P.2d 1049 (1999). Helmer acknowledges that he presented the self-defense instruction. Accordingly, he does not argue that the instruction's insufficiency would itself warrant reversal or retrial; rather, he asserts that the instruction's insufficiency demonstrated that the trial court erred and that defense counsel's performance was deficient.

5

knowing all the defendant knows and seeing all the defendant sees." State v. Janes, 121 Wn.2d 220, 238, 850 P.2d 495 (1993). In other words, the self-defense inquiry has both a subjective and an objective portion. Id. The subjective portion ensures that the jury fully understands the defendant's actions from the defendant's own perspective, while the objective portion allows the jury to determine what a reasonably prudent person similarly situated would have done. Id. The "justification of self-defense is to be evaluated in light of [a]ll the facts and circumstances known to the defendant, including those known substantially before the killing." State v. Wanrow, 88 Wn.2d 221, 234, 559 P.2d 548 (1977).

Helmer relies on Allery and Janes to argue that his self-defense instruction was inadequate. In Allery, the Washington Supreme Court considered a self-defense instruction in the context of a defendant who had suffered consistent physical abuse from the victim. 101 Wn.2d at 592-93. Allery came home one night to find her estranged husband in her house, in violation of a restraining order. Id. at 593. Her husband was lying on her couch and told her, "'I guess I'm just going to have to kill you sonofabitch. Did you hear me that time?'" Id. Allery tried to escape out a bedroom window. Id. She heard a metallic noise from the kitchen that she thought was her husband getting a knife. Id. She then took a shotgun from her bedroom and shot her husband, who was still lying on the couch. Id.

Allery's self-defense instruction stated, "The slayer may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the slayer at the time." Id. The Supreme Court found that this was inadequate, because it did not instruct the jury to "evaluate self-defense in the light of all

6

circumstances known to the defendant, including those known before the homicide." Id. at 594. The court reasoned that Allery's "theory of the case was that her intimate familiarity with her husband's history of violence convinced her that she was in serious danger at the time the shooting occurred." Id. at 595. Thus, the jury should have been instructed to consider self-defense "from the defendant's perspective in light of all that she knew and had experienced with the victim." Id.

Likewise, in Janes, the court recognized that a history of abuse with a victim can inform the reasonableness of a defendant's belief that he or she is in imminent danger. 121 Wn.2d at 239. There, the victim was a father figure to Janes and had physically abused Janes for years. Id. at 223. The evidence suggested that the victim had threatened Janes the night before the incident, and Janes's mother told him the next morning that the victim was still angry. Id. at 223-24. That afternoon, Janes shot the victim in the head as he came through the front door. Id. at 225.

In support of Janes's request for a self-defense instruction, a child psychiatrist testified that Janes suffered from PTSD as a result of the years of abuse. Id. at 226-27. The psychiatrist explained that PTSD caused Janes to perceive that he was constantly in danger and to be fearful of the victim. Id. at 227. As a result, the psychiatrist concluded that Janes feared imminent harm when he shot the victim. Id. at 227. The trial court denied the request for a self-defense instruction, because it found the events "too remote and insufficiently aggressive." Id. at 227-28.

The Washington Supreme Court concluded that the trial court had not properly considered the defense in light of Janes's subjective knowledge and perceptions. Id. at 242. It stated that

> the jury is to inquire whether the defendant acted reasonably, given the defendant's experience of abuse. Expert testimony on the battered person syndromes is critical because it informs the jury of matters outside common experience. Once the jury has placed itself in the defendant's position, it can then properly assess the reasonableness of the defendant's perceptions of imminence and danger.

Id. at 239. The court cautioned that evidence of abuse does not itself ensure that the defendant's belief in imminent harm was reasonable—the defendant must also present some evidence to show that his or her belief was reasonable at the time of the incident. Id. at 240-41. It remanded for the trial court to reconsider its ruling denying the self-defense instruction. Id. at 242.

In 1986, the pattern instruction was amended to address Allery. See State v. Goodrich, 72 Wn. App. 71, 77, 863 P.2d 599 (1993. The current version states:

> The person [using][or][offering to use] the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of [and prior to] the incident.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 17.02, at 253 (3d ed. 2008) (WPIC). The Court of Appeals has since recognized that WPIC 17.02 "correctly instruct[s] the jury on the subjective standard of self-defense." Goodrich, 72 Wn. App. at 77.

Helmer's instruction stated, in relevant part:

> The person using or offering to use the force may employ such force and means as a reasonably prudent person would use under the same or

similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of the incident.

This tracks WPIC 17.02.

Nonetheless, Helmer argues that his self-defense instruction did not properly instruct the jury. Helmer identifies two particular deficiencies in the self-defense instruction. First, he observes that the instruction did not explicitly inform the jury that it should consider the facts and circumstances known to him at the time of <u>and prior to</u> the incident. Second, he notes that it did not explicitly inform the jury that it should consider his past experiences that led to his PTSD. He asserts that <u>Allery</u> and <u>Janes</u> support the inclusion of this omitted language.

However, <u>Allery</u> and <u>Janes</u> do not compel the result Helmer seeks. The reasonableness of Allery's belief in imminent harm was based on her special knowledge of the surrounding facts and circumstances. <u>See Allery</u>, 101 Wn.2d at 595. That knowledge was acquired through her past experience with said facts and circumstances—namely, her husband historically posing a threat of violence. <u>See id.</u> Helmer had no such history with his victims, and he did not know them to be particularly dangerous. Thus, prior facts and circumstances were not implicated. It could not have been error to omit reference to facts and circumstances known to Helmer prior to the incident.

Nor was it error to omit reference to Helmer's past experiences. Unlike Allery and Janes, Helmer does not allege that his experiences themselves informed the reasonableness of his fear. <u>See Allery</u>, 101 Wn.2d at 595; <u>Janes</u>, 121 Wn.2d at 227. Rather, he argues that the experiences led to his current condition, the effects of which

9

caused him to feel more fearful than the average person would. See In other words, Helmer's theory of self-defense was that he acted reasonably for a person under the influences of PTSD. But, "testimony that a defendant suffers from [PTSD], standing alone, does not ensure that the defendant's belief in imminent harm was reasonable." Janes, 121 Wn.2d at 240. A defendant must also produce evidence that he or she perceived imminent harm "based on the appearance of some threatening behavior or communication" by the victim. State v. Walker, 40 Wn. App. 658, 665, 700 P.2d 1168 (1985). This ensures that the subjective portion of the self-defense inquiry does not subsume the objective portion:

> The objective portion of the inquiry serves the crucial function of providing an external standard. Without it, a jury would be forced to evaluate the defendant's actions in the vacuum of the defendant's own subjective perceptions. In essence, self-defense would always justify homicide so long as the defendant was true to his or her own internal beliefs. . . .
>
> "[I]f the reasonable person has all of the defender's characteristics, the standard loses any normative component and becomes entirely subjective."

Janes, 121 Wn.2d at 239-40 (alteration in original) (quoting Susan Estrich, Defending Women, 88 MICH. L. REV. 1430, 1435 (1990)). Thus, the self-defense inquiry involves consideration of facts as they truly existed, not as they were perceived based on the defendant's mental health.[2]

---

[2] Helmer's theory would be more appropriate for a diminished capacity defense. See, e.g., State v. Warden, 133 Wn.2d 559, 564, 947 P.2d 708 (1997) (disassociation caused by PTSD relevant to whether defendant lacked mental capacity to form the intent to kill); State v. Hamlet, 133 Wn.2d 314, 318, 944 P.2d 1026 (1997) (evidence of PTSD-related disassociation admitted as relevant to mental capacity to form intent); State v. Bottrell, 103 Wn. App. 706, 716-18, 14 P.3d 164 (2000) (flashbacks caused by PTSD relevant to ability to act with intent).

Helmer's instruction was based on WPIC 17.02, which the Goodrich court affirmed as a correct statement of the self-defense standard. 72 Wn. App. at 77. Helmer maintains that, even if a WPIC is sufficient under typical circumstances, it can be insufficient under the particular facts of a case. As support, he cites State v. Irons, 101 Wn. App. 544, 4 P.3d 174 (2000). In Irons, the appellant argued that a self-defense instruction failed to make the legal standard manifestly apparent, because it required the jury to find that "the defendant reasonably believed that the victim (rather than the victim and those whom the defendant reasonably believed were acting in concert with the victim) intended to inflict death or great personal injury." Id. at 546. The Irons court acknowledged that the instruction was substantially the same as the WPIC. Id. at 551. However, the court reasoned, simply because the instruction was "correct in the abstract, or correct as applied to one set of facts," was not determinative. Id. at 553. Under the facts of Irons' case, which involved multiple assailants, the court found that the WPIC could "easily be read to modify the portion of the charge that instructs the jury to consider all facts and circumstances as they appeared to the defendant." Id. at 552-53. As a result, the Court of Appeals found that the jury instructions were internally inconsistent and ambiguous. Id. at 553.

The present case is distinct from Irons. There, the instruction affirmatively misled the jury by instructing it to consider the defendant's belief that the victim, and only the victim, posed a threat of harm. See id. at 546. Here, there is no such confusion. This case is more like Goodrich, where the trial court rejected the defendant's more detailed proposed instruction in favor of WPIC 17.02. 72 Wn. App. at 77. Goodrich's proposed instruction told the jury to consider all factors bearing on the reasonableness of her

actions and apprehensions, including Goodrich's "past and present knowledge, her beliefs, the relative size and strength of the participants, [and her] words and actions prior to the incident." Id. at 74. The Court of Appeals found that WPIC 17.02 was sufficient, noting that the WPIC was "redrafted to take into account the subjective facts required by Allery" and that it "contains almost the same phraseology required by Allery." Id. at 77. It concluded that, "[w]hile Goodrich's proposed instruction is more detailed, the instruction given correctly states the law and allowed Goodrich to argue her case." Id.

Here, the self-defense instruction correctly stated the law. And, it was adequate on the particular facts of this case. The instruction was not constitutionally deficient. Accordingly, the trial court did not abuse its discretion in referring the jury back to its instructions in response to its questions. Nor did defense counsel provide ineffective assistance for proposing the instruction.

## II. Statement of Additional Grounds

In his statement of additional grounds, Helmer argues that there was insufficient evidence to support the element of intent as to his second degree assault convictions. To prove second degree assault, the State must show specific intent either to cause bodily harm or to create apprehension of bodily harm. State v. Byrd, 125 Wn.2d 707, 712-13, 887 P.2d 396 (1995).

There is sufficient evidence to support a conviction if, when viewed in the light most favorable to the State, the evidence permits a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Tilton, 149 Wn.2d 775, 786, 72 P.3d 735 (2003). When an appellant challenges the sufficiency of the evidence, he

admits the truth of the State's evidence and all reasonable inferences that may be drawn from it. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Helmer was convicted of four counts of second degree assault: three counts for brandishing his gun at Miller, Washburn, and Lescault, and one count for shooting Hardin.

Miller, Washburn, and Lescault each testified about the incident. Washburn testified that he came out to help break up the fight and when he turned around, Helmer[3] was pointing a gun at him. Miller testified that Helmer looked Miller in the eye and held the gun about six inches from their faces for about five seconds. Lescault testified that Helmer pointed the weapon directly at Lescault's face, held it steady, and looked Lescault right in the eyes. Lescault continued,

> And then [Helmer] immediately pointed [the gun] to my left, and I imagine it was maybe where one of the other people were, and pointed it right there for a second, then immediately pointed it again. It wasn't like a wave. Just sort of waving it at a crowd. It was specifically the feeling I got was what he did to me right in the face that he was pointing it right in the face of people off in the flank that I couldn't see.

Lescault felt that "if [Helmer] pulled the trigger he was so close that he was not going to miss." He further testified that "it was completely clear to me at the time that it was a warning, and that if I had taken even one step further that he would have shot me right in the face." There was sufficient evidence for the jury to conclude that Helmer intended to create an apprehension of bodily harm by pointing his gun at Miller, Washburn, and Lescault.

There was likewise sufficient evidence for the jury to find that Helmer intentionally assaulted Hardin, either by causing bodily harm to Hardin or, at the very least, by creating

---

[3] Although Miller, Washburn, and Lescault did not refer to Helmer by name, Helmer testified that he was the person who pointed the gun at them.

an apprehension of such harm. Helmer testified that when he was trying to pull Dahl out of the fight, he felt someone push him from behind. He remembered going for his gun, and stated that the "next thing I know, my hand's up with the gun." When asked at trial if he pulled the trigger and shot Hardin, he responded, "Apparently, yes."

Hardin testified that he intervened in the fight, attempting to help Shandy. He stated that two men were assaulting Shandy, and Hardin grabbed the one closest to him. Hardin let go when he noticed that the other man had a gun. He felt dizzy and realized he had blood all over his body. He had been shot in the shoulder. The bullet traveled into his chest.

The testimony suggests that Helmer was in control of the gun directly following the gunshot. One onlooker testified that Helmer[4] initially pointed the gun in the direction of the fight on the ground and then pointed it at the people exiting the bar. Another onlooker testified that, after he heard a gunshot, he saw Helmer standing there holding a gun. When asked the position of the gun, Williams said "it wasn't at me and I wouldn't say it was up in the air. It was kind of like somewhere in between there I guess is the best way I can describe it." A third witness stated that after the gunshot he saw Helmer holding the gun "in a way to kind of get the crowd to back off." There was sufficient evidence for a jury to conclude that Helmer intended to cause bodily harm to Hardin or to create an apprehension thereof.

Helmer also asserts that findings of fact and conclusions of law have not yet been entered and thus he is entitled to a retrial. He does not elaborate on this assertion or cite

---

[4] The witness testified that the man with the gun was wearing a green jersey. Helmer testified that he had a green jersey on and that he pulled out his gun and pointed it at the people coming out of the door.

authority to support it. "Passing treatment of an issue or lack of reasoned argument is insufficient to allow for our meaningful review." State v. Stubbs, 144 Wn. App. 644, 652, 184 P.3d 660 (2008), rev'd on other grounds, 170 Wn.2d 117, 240 P.3d 143 (2010); RAP 10.3(a)(6).

We affirm.

Appelwick, J.

WE CONCUR:

Dwyer, J.

Becker, J.